SEE, Justice
(dissenting).
Because I do not agree that the City of Birmingham should be liable in' this case for damages based on the injuries inflicted on a guard by prisoners at the city jail, I respectfully dissent.
The City of Birmingham employed Janet Waits as a guard at , the city jail. After another guard had confiscated alcohol from some of the prisoners, Waits was in the cellbloek, unaccompanied by any other guard, and she was there in accordance with jail regulations.[2] She instructed several prisoners who were peacefully standing outside their cells to go back into their cells. As the prisoners walked toward their cells, a fight suddenly broke out between two, and then among several, prisoners. Waits radioed for assistance. One prisoner knocked the radio out of Waits’s hand, and a few of the prisoners assaulted her. Although Waits heard no answer on her radio, other guards heard her call and responded in sufficient force to quell the disturbance. Sergeant Franklin did not hear Waits’s first two calls, but she heard a later transmission and she also sent help. Waits filed this action under Ala.Code 1975, § 25-6-1, against the City, alleging negligent hiring and supervision of. its jail employees.
The trial court charged the jury that it could find the City liable under § 25-6-1[3] for negligent administration of the jail.[4] Waits presented evidence indicating that the City was on notice of radio problems and understaffing problems at the jail. The City responded by arguing that it had no duty to protect Waits from the criminal acts of the prisoners. A jury awarded Waits $100,000, and the City appealed from the judgment entered on that verdict.
As a general rule, a person has no duty to protect another from the criminal acts of a third party. See, e.g., Moye v. A.G. Gaston Motels, Inc., 499 So.2d 1368, 1370 (Ala.1986). A narrow exception to this rule allows a defendant to be held liable for the criminal acts of a third party where there are “special *1132 circumstances.” Saccuzzo v. Krystal Co., 646 So.2d 596, 596 (Ala.1994) (citing Restatement (Second) of Torts § 315 (1965)).[5] This “special circumstances” exception can apply where an employee is injured on the job. See Lillie v. Thompson, 332 U.S. 459, 461 & n. 3, 68 S.Ct. 140, 141-42 & n. 3, 92 L.Ed. 73 (1947).
Because the duty imposed on employers by § 25-6-1 is defined in terms of “negligence,” the “no liability for Criminal acts” rule and its “special circumstances” exception serve as a common-law guide in determining the scope of the City’s statutory duty to act reasonably toward .Waits. We have stated:
“‘When conditions of employment are such that they invite attack upon employees by creating highly unusual and unreasonable exposure to danger without the employment of reasonable protective measures there is justification for imposing liability upon the employer when injury results.
“ ‘There is perhaps some exposure to the criminal acts of third persons in any employment but we recognize that the degree of exposure varies considerably from one type of employment to another. Thus the bookkeeper, the industrial worker, or the clerk in a mercantile establishment is probably less likely to be murdered on the job than is the policeman, the night watchman, the teller in a branch bank or the attendant at an all-night service station.
“ ‘But even so, the employer of the night watchman, the bank teller, or the service station attendant is not the insurer of his safety from attack. Even in those occupations which ordinarily entail a substantial risk of exposure to criminal acts of third persons, we think liability should not attach to the employer unless it is clearly shown that the employer in some manner greatly and unreasonably increased that risk without taking reasonable precautions for the safety of the employee.’ ”
Parham v. Taylor, 402 So.2d 884, 886 (Ala.1981) (quoting Thoni Oil Magic Benzol Gas Stations, Inc. v. Johnson, 488 S.W.2d 355, 357 (Ky.1972)) (emphasis added).
It is fundamental that the scope of the duty to take “reasonable precautions” is defined by what is reasonable under the circumstances. See O.W. Holmes, Jr., The Common Law 111 (1881) (stating that the law of negligence binds defendants to an objective standard “to use such care as a prudent man would ... under the circumstances”). Thus, the scope of the City’s duty to protect its employee-guards should be defined in light of the risks associated with operating the jail and the ability of the City to reasonably avoid those risks.
Because prisoners are potentially violent, it is reasonable to require the jail operator to protect its employee-guards by providing them with properly functioning equipment and by adequately staffing the jail. It would be unreasonable to administer a jail in such a way as to expose a guard to potentially hostile inmates with inoperable equipment or insufficient backup. Injuries proximately caused by such unreasonable administration should be compensable.
A reasonable municipality, however, does not have the duty to protect its guards from the very risk that necessitates their employment. Jails contain violent prisoners. See generally Dothard v. Rawlinson, 433 U.S. 321, 335-36, 97 S.Ct. 2720, 2729-30, 53 L.Ed.2d 786 (1977) (noting that violence in Alabama prisons is common). Such prisoners will, on occasion, assault one another. See, e.g., Beavers v. Carter, 644 So.2d 23 (Ala.Civ.App.1994) (action by one prisoner *1133 based on assault by another prisoner). Violent proclivities are often the very reason the person is in jail and, once there, is supervised by guards. It is inevitable that guards will, on occasion, be assaulted. Dothard, 433 U.S. at 336, 97 S.Ct. at 2730. A reasonable municipality cannot be required to prevent all potential assaults. To do so would require continual sedation of the prisoners, isolation of the prisoners in solitary confinement, or chaining.[6] The inherent risks associated with guarding, potentially hostile .prisoners (e.g., the risks of exposure to verbal abuse and physical injuries) are an unfortunate, but routine, part of a guard’s job, and they do not constitute a “highly unusual and unreasonable exposure to danger.”[7] Parham, 402 So.2d at 886 (quoting Thoni Oil, 488 S.W.2d at 357).[8]
The only breaches of duty the City may have committed, failing to provide adequate radios and adequate staffing, were not the proximate cause of Waits’s injuries. While some of the radios at the jail may not have been operable, the .undisputed evidence showed that Waits’s radio operated and alerted the other guards to come to her aid. While Sergeant Franklin may not have heard Waits’s first two radio calls, other guards did and rushed to her assistance. Further, while understaffing may have , caused certain problems in the jail, it is undisputed that the number of guards who came to assist Waits was sufficient to quell the disturbance. In short, the breaches complained of did not directly, or even proximately, cause Waits’s injuries. While the City’s providing a better radio[9] might have allowed Waits to hear a *1134 response, which in turn might have allowed the prisoners to hear that other guards were coming, which in its turn might have prompted some prisoners to refrain from assaulting Waits, this attenuated chain of “might have beens” is far too speculative to constitute a proximate cause of Waits’s injuries. See generally Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, J.).
Waits’s injuries occurred while she was escorting to their cells prisoners who were not exhibiting violent behavior. The prisoners suddenly started fighting with one another, and Waits was injured. In my view, Waits’s injuries were not proximately caused by the City’s breach of a duty because the City does not have a duty to insure that potentially violent and hostile prisoners are never violent or hostile.
I must therefore dissent.
HOOPER, C.J., and MADDOX, J., concur.

. Jail regulations prohibited a guard from entering a cellbloek alone during a fight or a riot. Generally, however, guards could enter a cell-block alone when the prisoners were not exhibiting violent behavior.

. Ala.Code 1975, § 25-6-1, provides, in pertinent part:
"(a) Except as otherwise provided by law, when a personal injury is received by a servant or employee in the service or business of the master or employer, the master or employer is liable to answer in damages to such servant or employee, as if he. were a stranger and not engaged in such service or employment, provided such liability is enforced in .a court of competent jurisdiction, in the cases following:
[[Image here]]
"(2) When the injury is caused by reason of the negligence of any person in the service or employment of the master or employer who has any superintendence intrusted to him, while in the exercise of such superintendence.
“(3) When such injury is caused by reason of the negligence of any person in the service or employment of the master or employer, to whose order or directions the servant or employee at the time of the injury was bound, to conform and did conform, if such injuries resulted from his having so conformed."
Although Waits, in her complaint, alleged that several City employees were negligent, this appeal concerns only the City.

. Ala.Code 1975, § 25-6-l(a), imposes liability on an employer whose negligence causes the personal injury of an employee. In certain instances, this' provision applies to municipalities. See, e.g., City of Birmingham v. Hale, 574 So.2d 784 (Ala.1991).

. A "special relationship" can also give rise to a defendant’s liability based on the criminal acts of a third party. Saccuzzo v. Krystal Co., 646 So.2d at 596 (citing Restatement § 315). A special relationship that can give rise to a duty to protect a person from criminal acts is present where the plaintiff is specially and wholly dependent on the defendant. See, e.g., Young v. Huntsville Hosp., 595 So.2d 1386, 1388-89 (Ala.1992) (holding that a special relationship existed between a sedated and helpless person and the hospital where she was a patient); Thetford v. City of Clanton, 605 So.2d 835, 838-40 (Ala.1992) (holding that a special relationship existed between an innkeeper and a battered wife where the innkeeper had actual knowledge of the husband's threat against his wife but, nonetheless, provided the husband access to the wife’s room). Waits, far from being specially and wholly dependent on the City, was a trained and experienced corrections officer. Thus, no "special relationship” existed.

. Such treatment itself would, if applied to the general prison population, give rise to a deluge of prisoner lawsuits.

. This analysis is similar to, but more compelling than, the so-called "fireman’s rule” that precludes a fireman from recovering damages from a person who negligently started a fire. The risk of such negligence is inherent in the fireman’s occupation. See Krauth v. Geller, 31 N.J. 270, 157 A.2d 129 (1960) (holding that a property owner did not have a duty to a fireman to exercise reasonable care to avoid the special risks for which the fireman is trained and paid); David L. Strauss, Comment, Where There’s Smoke There’s The Fire Fighter's Rule: Containing the Conflagration After One Hundred Years, 1992 Wis. L.Rev.2031, 2035-36. Negligent fires are generally avoidable. The violent and hostile nature of prisoners, many of whom are incarcerated because of violent and hostile acts, is not. See generally Dothard v. Rawlinson, 433 U.S. 321, 335-36, 97 S.Ct. 2720, 2729-30, 53 L.Ed.2d 786 (1977) (stating that Alabama prisons contain violent inmates).

. This duty analysis has also been characterized as "primary assumption of risk”:
"(1) In its primary sense the plaintiff's assumption of risk is only the counterpart of the defendant’s lack of duty to protect the plaintiff from that risk. In such a case plaintiff may-not recover for his injury even though he was quite reasonable in encountering the risk that caused it. Volenti non fit injuria. (2) A plaintiff may also be said to assume a risk created by the defendant’s breach of duty toward him, when the former deliberately chooses to encounter that risk.... Hereafter, we shall call this 'assumption of risk in the secondary sense.’ ”
4 Fowler V. Harper, et al., The Law of Torts § 21.0, at 189 (1986) (emphasis added) (footnotes omitted). Similarly, Professors Prosser and Keeton state:
"[Primary assumption of risk occurs] where the plaintiff voluntarily enters into some relation with the defendant, with knowledge that the defendant will not protect him against one or more future risks that may arise from the relation. He may then be regarded as tacitly or impliedly consenting to the negligence, and agreeing to take his own chances. Thus, he may accept employment, knowing that he is expected to work with a dangerous horse; or ride in a car with knowledge that the brakes are defective, or the driver incompetent.... [T]he legal result is that the defendant is simply relieved of the duty which would otherwise exist.”
Prosser & Keeton, The Law of Torts 480-81 (5th ed.1984) (second emphasis added) (footnotes omitted). In any event, an employer’s duty under § 25-6-1 is subject to various defenses, such as contributory negligence and assumption of risk. See, e.g., Lee v. Shrader, 502 So.2d 741, 743 (Ala.1987) ("Contributory negligence is a defense under § 25-6-1.”) (citing Parham v. Taylor, 402 So.2d 884, 887 (Ala.1981) (stating that "it is clear that the defenses of contributory negligence and assumption of risk are available” to employers defending against a negligence claim brought by an employee)).

.I note that Májor Frank Alexander, the chief jail administrator, testified:
"We tested everything from inexpensive Japanese [radios] to the most expensive ones on the market, and we. could not find any radio that transmits in the jail without some type of interference. It’s just due to the fact of the construction of the jail. There is so much steel *1134 and so much metal. The steel bounces and locks your radio signals.”